UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

WANDA A. SMITH,                  :
                                 :
          Plaintiff,             :
                                 :
V.                               :  Case No. 3:08-CV-1735 (RNC)
                                 :
AFSCME COUNCIL 4;                :
AFSCME INTERNATIONAL,            :
                                 :
          Defendants.            :

<u>RULING AND ORDER</u>

Plaintiff brings this suit against AFSCME International ("International") and AFSCME Council 4 ("Council 4"), claiming that she was removed from her position as president of AFSCME Local 538 ("Local 538") because of her race and in retaliation for her protected activity on behalf of minority members of the Local.  Plaintiff alleges that she was a longtime advocate for minority union members, who received inadequate representation from Council 4 at grievance proceedings.  In retaliation for her advocacy, plaintiff alleges, Council 4 Executive Director Sal Luciano conspired to have International audit Local 538 and fabricate the results of the audit in order to provide a pretext for removing plaintiff and her treasurer, Nelson Leon.  Plaintiff further alleges that she and Leon were removed without an adequate opportunity to be heard.  Plaintiff claims defendants' alleged actions violate 42 U.S.C. §§

1981, 1985, 1986 and 2000e, *et seq.*, as well as state law.

In 2009, defendants moved to dismiss plaintiff's complaint (docs. 46 & 61), on the ground that she was properly removed for misappropriating union funds.  The motions were denied in order to give plaintiff an opportunity to conduct discovery and gather evidence demonstrating that defendants' actions were motivated by her race or taken in retaliation for her protected activity. Defendants now move for summary judgment pointing out that, although plaintiff has been given ample opportunity to engage in discovery, she lacks competent evidence to support her claims.  After careful review, I conclude that the defendants are correct and, accordingly,  the motions for summary judgment are granted in full.

I.  Summary Judgment Standard

A court will grant summary judgment if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  To avoid summary judgment, a plaintiff must point to evidence that would permit a jury to return a verdict in her favor.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986).  In the absence of such

evidence, summary judgment will be granted.  See Weinstock
v. Columbia Univ., 224 F.3d 33, 41 (2d Cir. 2000).  In
determining whether summary judgment is proper, the record
must be viewed in the light most favorable to the plaintiff.
See Sheppard v. Beerman, 317 F.3d 351, 354 (2d Cir. 2003).
However, in opposing summary judgment, the plaintiff must
not "replace conclusory allegations of the complaint . . .
with conclusory allegations of an affidavit" but instead
must offer "significant probative evidence tending to
support the complaint." Lujan v. Nat'l Wildlife Fed'n, 497
U.S. 871, 888 (1990) (internal quotations omitted).

II.  Facts

    The summary judgment record, viewed most favorably to
the plaintiff, shows the following.

    A.  Background

    Plaintiff Wanda Smith, an African-American woman, has
been employed by the State of Connecticut Department of
Social Services ("DSS") since 1982, and she has been a
member of Local 538 since approximately 1987.  Plaintiff
served as president of Local 538 for approximately 18 years,
beginning in 1989 and ending with her removal in 2006.
Nelson Leon served as treasurer of Local 538 during

plaintiff's tenure as president.

AFSCME is a large labor union representing approximately 1.4 million employees in state and local government and the healthcare industry.  AFSCME is a tri-level organization: International is the parent organization, which issues charters to Councils and Locals. Fifty Regional Councils, including Council 4, operate below International, and approximately 3,500 Locals form the basic units of the union.  Council 4 represents about 35,000 workers divided among approximately 100 Locals.

Councils are autonomous entities, independent from International.  International may exercise control over Councils only through an administratorship.  Locals are each affiliated with a Council, but they also are legally distinct entities.  AFSCME's constitution requires each Local to remit a "per capita tax," a portion of its member dues, to its Council and International.

AFSCME provides an informal three-step grievance process for union members who have been subject to an adverse employment action.  At Step I, the Local files a grievance with the employer agency.  The grievant and local union representative speak with the grievant's supervisor.

At Step II, they meet with a representative of the employer
agency's human resources department.  If the issue remains
unresolved, the Local can file an appeal, which results in
Step III.  At that point, a copy of the grievance is sent to
a Council service representative, who advises the grievant
of a date for a hearing regarding the appeal.  At the
hearing, the Council representative, the local union
president (or steward) and the grievant appear before a
three-person panel, comprised of two individuals from state
agencies and one union representative.

    B.  <u>History of Protected Activity</u>

    Plaintiff alleges that Council 4 repeatedly provided
inadequate representation to minority union members at Stage
III of this grievance process – the point at which she, as
president of Local 538, no longer had direct control over
the representation of the grievant.  She claims that she
regularly fought for these minority grievants, insisting
that they be represented by competent advocates and that
those advocates present evidence that she believed would aid
the grievants' claims.  Plaintiff recites a number of
examples of allegedly inadequate representation.  These
examples are supported by her affidavit or Leon's affidavit

almost exclusively, and are therefore admissible only to the extent that she and Leon have personal knowledge of the events.  See Fed. R. Civ. P. 56(c)(4).

In 1985, plaintiff herself was threatened with termination, and Carol Dimmock, then-president of Local 704, assigned a novice union steward to plaintiff's Loudermill hearing.  When plaintiff complained to Council 4, they simply referred her back to Dimmock.  Ultimately, plaintiff was transferred to a different agency, not terminated.

The state laid off Leon, a Hispanic man, in 1997, while he was a Local 704 union steward.  Plaintiff claims that this was a violation of the labor bargaining agreement but provides no evidence of that beyond Leon's own statement.  Council 4 refused to challenge the layoff, which Leon says was "unheard of."  Leon had been a vocal advocate for minorities and a vocal critic of Dimmock.  Leon states that Dimmock engaged in financial mismanagement but the record contains little admissible evidence to support his statement.[1]  Leon also states that Dimmock arranged for him

---

[1] Leon states that he led inquiries into allegations of financial mismanagement by Dimmock with regard to personal vehicle purchases.  He avers that Dimmock failed to disclose vehicle purchases and put at least one vehicle up for sale.  Leon claims that he saw at least one advertisement for a car.

to be laid off but the record does not show that he has personal knowledge of facts to support this statement.

Also in 1997, plaintiff represented Nigel Morris, an African-American man, in his termination grievance.  At Step III, she was replaced by Council 4 representative John Little.  Plaintiff complained about Little's representation to Council 4's then-executive director, and Little was replaced by Kelly Cashman.  Morris eventually signed a settlement agreement that relabeled his termination a "resignation."  He was rehired by the Department of Social Services in 2006 and became a member of a labor union unaffiliated with AFSCME.  Morris later wrote a letter to Council 4 Executive Director Salvatore Luciano, and sent a copy of the letter to the plaintiff, stating that the terms of the settlement were not being honored.  Plaintiff alleges that Luciano contacted DSS as a result of this letter, although she does not explain why she is competent to testify to this fact.  DSS then accused Morris of lying on a job application by failing to state that he was terminated from his earlier position, and the ensuing investigation resulted in his termination.  His union represented him successfully in his grievance proceeding, and he was

reinstated with backpay.

Beginning in 2000, plaintiff sought reclassification from her position of "Secretary II" to "Administrative Assistant" and later to "Pre-Professional Trainee." Plaintiff had previously complained about the quality of Cashman's representation, but Council 4 assigned Cashman to her grievance anyway.  The grievance process took several years, even though, according to plaintiff, it usually takes only about one year.  Plaintiff does not offer admissible evidence for the usual grievance timeline.  In May 2003, when plaintiff was seeking to be reclassified as a Pre-Professional Trainee, an email between DSS human resources staff members stated that the reclassification hearing would be for the Administrative Assistant position, not a Pre-Professional Trainee position.  The author of the email indicated that she had spoken with Cashman, who would talk with plaintiff about the subject of the hearing.  The author also indicated that, if necessary, plaintiff's manager would be called to testify that plaintiff was not performing the duties of a Pre-Professional Trainee.  Plaintiff's manager had in fact supported plaintiff's desired reclassification. Plaintiff claims this email shows that Cashman was colluding

with DSS to deny her a Pre-Professional Trainee position.
Plaintiff was ultimately reassigned to a different unit
where she performed the duties of an Administrative
Assistant.  She complained about Cashman's alleged collusion
to Council 4 staff representative Gayle Hooker, who is
herself African-American, calling Cashman's behavior "racial
and biased" and "the same racial discriminatory practices
that I have complained to you repeatedly."  Plaintiff admits
she does not know of any reclassification grievance where
Cashman represented a white grievant differently.  However,
several Caucasian employees were reclassified favorably
without filing grievances.  Their employers, not Council 4,
decided to reclassify them.

Plaintiff and Leon represented Norma Parmalee, an
African-American woman terminated from her position after
taking a medical leave in 2001.  Council 4 service
representative Marie King took over at Step III.  Plaintiff
found evidence that Caucasian employees had not been fired
when they took more time off than Parmalee, but King refused
to introduce this evidence at Parmalee's hearing.  Plaintiff
complained about King's representation to Hooker and
requested a different representative.  At this point,

plaintiff had complained about all of Council 4's service representatives, so she insisted that Hooker herself represent Parmalee.

In 2002, plaintiff represented Richard Parmalee, an African-American man who was terminated from his position. When she learned that representative Little was assigned to Parmalee's case at Step III, plaintiff demanded that Hooker take over the representation.  As a result of Hooker's representation, Parmalee's termination was rescinded.  When he was again terminated, Hooker again represented him, and again, he was reinstated.

In 2003, Leon represented Vicky Ward, an African-American woman who had been terminated for downloading a non-business related brochure on a state-issued computer. When Cashman assumed the representation at Step III, she failed to introduce evidence that Ward's white co-workers had misused work computers – including by viewing pornography – and had not been terminated.  At a meeting of Local 538's Executive Board, Cashman stated that she withheld this evidence at Hooker's direction.  When Leon confronted her, saying her conduct was discriminatory, the two argued, and the Board voted not to pay Cashman for the

grievance.  Ward was upset when she found out what Cashman
had done.  Plaintiff sent Ward an email advising her to file
a complaint with her agency's affirmative action unit.  She
sent a copy of the email to Luciano, Hooker and Cashman.
Cashman was later arrested on drug charges and removed from
her position.

     In 2005, plaintiff and Leon represented William Barron,
an African-American man who had been terminated after a
hitchhiker he picked up stole a pack of cigarettes resulting
in Barron's arrest.  Service representative Sellas took over
at Step III of the grievance process.  The grievance was
dismissed, but Sellas failed to introduce evidence that the
charges against Barron had been dismissed.  Plaintiff and
Leon addressed Sellas about this failure at an Executive
Board meeting, and Leon accused him of race discrimination.

     Plaintiff's co-worker Wanda Bush was terminated in June
2006 for attendance problems.  Plaintiff and Kim Thomson
represented Bush during the first two Steps, and Sellas took
over at Step III.  Sellas failed to present evidence that
Bush was on a modified work schedule for leave under the
Family Medical Leave Act.  Plaintiff and Thomson complained
to Council 4 Staff Representative Jeff Scanlon that Sellas's

allegedly inadequate representation was due to Bush's race.

Plaintiff and Thomson also represented Isabel Freitas, a Hispanic woman allegedly fired from DSS for attendance problems in June 2006.  Sellas took over at Step III.  At Freitas's hearing, plaintiff, Thomson and the grievant pressured Sellas to introduce certain medical records. Sellas tried to convince plaintiff to persuade Freitas to withdraw the grievance, asserting that Freitas was having an affair with DSS's Fiscal Director.  Plaintiff refused, and Sellas loudly told DSS officers not to worry about plaintiff, because she was about to be removed.

Thomson, a Caucasian woman and avid advocate for minority rights, collaborated with plaintiff and Leon after their termination.  In September 2006, she sent a letter to International President Gerard McEntee protesting plaintiff and Leon's removal.  AFSCME International official Pat Glynn removed Thomson from her position as a union steward in June 2007.  Thomson filed a retaliation complaint with the Commission on Human Rights and Opportunities.

Plaintiff compares these instances of minority grievants receiving allegedly inadequate representation to the case of Rosemary Cusano, a white woman who was

terminated in 1995 for poor attendance.  While a terminated
employee is required to file a grievance within 30 days of
her dismissal, Council 4 Service Representative Little did
not file Cusano's grievance until June 1996, over a year
after she was terminated.  Instead of dismissing the
grievance, Local 704 and Council 4 processed the grievance
with the cooperation of State of Connecticut management.
The union and the state negotiated with AFSCME leading to
reinstatement of Cusano's employment.  Plaintiff alleges
that this type of cooperation between the union and the
state did not occur when grievants were African-American.
In 2005, Cusano was again terminated for attendance and poor
performance.  The hearing officer at Step III acknowledged
that Cusano's grievance was untimely as to the performance
review that precipitated her dismissal.  Even so, the case
settled in Cusano's favor.

In addition to advocating on behalf of minority members
with regard to representation at Step III of the grievance
process, plaintiff advocated on behalf of her Local at the
2004 AFSCME International convention in Anaheim, California.
At the convention, she addressed her fellow delegates
concerning a proposal to increase member dues.  Plaintiff

spoke in opposition to the proposed dues increase stating that it would pose a hardship to the members of her Local, 85 percent of whom were members of minority racial groups. Members of Council 4 were present at the time.

C.    Events Leading to the Audit of Local 538

On September 10, 2005, International President McEntee received a letter from "Concerned Members of AFSCME Local 538."[2]  The letter stated that plaintiff and Leon had misspent Local 538 funds for their own benefit, that plaintiff had made illegal entries in Local 538 Executive Board minutes in order to hide improper expenditures, and that plaintiff and Leon had threatened members with violence if they pursued an inquiry.  Plaintiff alleges that these charges were false.  The letter to McEntee was referred to International's auditing department.[3]

In March 2006, Luciano exchanged emails with members of

---

[2] International cites to McEntee's declaration for this proposition.  In fact, the declaration says the letter was received in 2006 and was anonymous.  However, plaintiff has admitted International's assertion regarding the letter, so I accept it for purposes of this motion.

[3] Plaintiff's brief implies that charges filed by Bethy Guiles-Smith, discussed *infra*, spurred the investigation into Local 538's finances.  See Pl.'s Br. 57.  The evidence shows that Guiles-Smith filed her charges in October 2006, and that Luciano discussed investigating Local 538 with International's auditing department in March 2006.  Therefore, the audit preceded Guiles-Smith's charges.

-14-

International's auditing department.  When members of the department questioned whether they should conduct an audit, Luciano indicated that they should, stating that the letter from the Local 538 members provided good cause for an audit.[4]  When members of the department asked, "What's your pleasure?", Luciano replied, "Not my pleasure, but the pleasure of the original members who complained might be to address the concerns they expressed in the original letter." When asked if he was requesting an audit, he wrote, "When [Local] 704 members requested an audit of their local, you did one.  Is there some reason why the decision to move forward on 538 is dependent on me?"  The auditing department elected to conduct an investigation of Local 538.[5]

In May 2006, the auditing department sent Owen Martin to investigate.  When Martin looked at Local 538's per capita tax reports, he noted that 538 had reported exactly 453 dues-paying members every month from February 2004 to February 2006.  This raised questions about the accuracy of

---

[4] Luciano's email refers to a letter signed by 20 members. It is unclear whether this is the September 10, 2005 letter or a different one, but neither party discusses a second letter and the letter itself is not in the record.

[5] Plaintiff alleges that Luciano threatened the audit department into investigating, but the record contains no evidence of threats.

Local 538's reporting because the number of members in a local usually varies month to month.  Although Martin thought this provided good cause to continue the audit, plaintiff asserts it was just a pretext.[6]

D.   The Audit

Martin arranged for an on-site review of Local 538's files.  During the review, he found that Local 538 had not kept cancelled checks, as required.  He also found that Local 538 had too few "QuickBooks" records, and the records they did have were incomplete.  He found no records of paid bills to support payments made by Local 538, nor were there minutes from meetings, financial reports, or 990 or 990EZ tax forms.  Martin received no explanation for much of the inadequate record-keeping, although plaintiff and Leon did tell him that former Local 538 Officer Linda Franco had wrongfully taken a number of financial records when she left.  Martin also compared Local 538's membership dues income with its per capita tax remittance reports.

After finishing the review, Martin drafted a preliminary report, which found that between 2002 and 2006,

---

[6]   In addition, International had not received Local 538's monthly financial reports, but the records had been submitted by the Local as required.

Local 538 had under-reported its membership and underpaid
its per capita taxes.  The report concluded that there was
no reasonable explanation for this other than defalcation.
Plaintiff acknowledges that Martin's report contained these
findings but claims they were false and pretextual.
Although Local 538 had under-reported its membership in
certain years, she states, those years did not include 2002,
and the under-reporting stemmed from a good faith
misunderstanding.  In fact, Local 538 had over-reported its
membership for a number of prior years.

     The 2006 International Constitution provides that if
the International president finds a subordinate body has
deliberately filed false financial reports, and the
president believes an emergency situation exists, he may
place the body under administratorship pending notice and a
hearing.  The hearing must occur within 21 days of the
administratorship.  An administrator has the authority to
take possession of all the subordinate body's property and
suspend its officers from office.


     After receiving a final report incorporating Martin's
findings, McEntee wrote a letter to International's Judicial

Chairperson stating that he believed an emergency situation existed and he was appointing Patricia Glynn as administrator over Local 538.[7]  In July 2006, Glynn advised plaintiff and Leon of the administratorship, told them they were suspended immediately, and directed them to turn over all Local 538 property.  Karen Tyler, an African-American woman, took over for Martin, who had fallen ill and was unable to continue the audit.

Tyler completed her audit and filed her findings on July 20, 2006.  Tyler found that a number of reimbursement checks had been issued to Tyler and Leon for round sums – first $100, later $1000 – and expense reports did not support these checks.  She found that plaintiff's reimbursement reports contained both receipts and a claim for mileage, and the mileage appeared to be calculated so as to make the total request for reimbursement equal $1000.  Tyler also found pre-signed checks; reimbursements for repairs to Leon's personal car, Stop & Shop purchases, expenses for holiday party raffle items, including for a holiday party that was never held; and meals for one or two

_____

[7] Plaintiff alleges the real motivation for the administratorship was an agreement with Luciano to deprive plaintiff and Leon of their rights.  Plaintiff does not cite to admissible evidence supporting this claim.

that included alcoholic beverages or kids' meals.  These
expenses had reportedly been approved by the Executive
Board, although Tyler found that minutes from Executive
Board meetings did not reflect approval.  After the audit,
International obtained financial statements from the credit
union that corroborated Tyler's findings.

E.   Removal of Plaintiff and Leon from Office

International's Judicial Chairperson, John Seferian,
held a hearing on the administratorship on July 24, 2006.
Plaintiff and Leon both testified at length and offered
explanations for the audit findings.  They admitted that
"mistakes were made."  Leon explained that the reason he
under-reported the per capita tax owed was because he had
found out Local 538 was being charged for people who were
not actually members of the Local.  Therefore, he went
through the roster of taxable members and only paid the tax
for those members who were actually in his Local.[8]  During
the hearing, plaintiff cross-examined Tyler.  Plaintiff

_____

[8] It appears that the Comptroller had disbursed money to
Local 538 for all the members on its roster; therefore, Leon was
taking in money for more members than he was paying for in per
capita taxes.  In his affidavit, Leon notes that when he became
Treasurer in 1999, he found out Local 538 had been overpaying per
capita tax since 1992.  When he brought this to Council 4's
attention, the Council instructed him on how to recoup the lost
funds over a period of 6 months.

claims that she was not given a fair opportunity to be heard
and to present witnesses and evidence.

In a decision issued on August 22, 2006, Seferian
upheld the administratorship, recounting the testimony of
Tyler, plaintiff and others.  He did not recount Leon's
testimony in full.  Seferian found that there was a threat
Local 538 funds would be lost, that Local 538 had filed
false returns, and that Local 538 had violated the Code.
Plaintiff appealed this decision to the International board,
but the decision was upheld.

In October 2006, approximately 70 members of Local 538
led by Bethy Guiles-Smith filed formal charges against
plaintiff and Leon.  According to plaintiff, Council 4
Executive Director Sal Luciano and International official
Pat Glynn wrote the letter and ordered Bethy Guiles-Smith to
sign and send it.  Plaintiff claims that Guiles-Smith did as
she was told, although the charges in the letter were false,
because Luciano and Glynn promised her a promotion and the
Local 538 presidency in exchange for signing and sending the
letter.  Luciano chose Guiles-Smith, plaintiff insists,
because she is African-American and the letter would
therefore not appear racially motivated.  Plaintiff alleges

that Guiles-Smith was later deemed a "trouble maker," however, and was denied the presidency in favor of a more "docile" black union member.  After being passed over for the position, plaintiff claims, Guiles-Smith revealed the story behind the letter.

Plaintiff has not presented admissible evidence to support these allegations.  She relies on two of her exhibits.  First, plaintiff cites an affidavit from Kim Thomson, in which Thomson declares that Guiles-Smith told her (Thomson) about being recruited to file charges.  This hearsay is not admissible evidence.  Further, this affidavit does not mention Glynn in connection with the charges. Second, plaintiff relies on an email sent by Guiles-Smith after she was denied the presidency.  To the extent this email is submitted for the truth of the matter asserted, it too is hearsay.  Further, the email does not say the letter to McEntee was fabricated; it only refers generally to "deceit, falsification of documents, and misleading information from both Council 4 and Patricia Glynn" and withdraws all charges against plaintiff and Leon.  An affidavit from Ms. Guiles-Smith might have sufficed to support plaintiff's allegations; the hearsay in the record

cannot.

When a new president, Dawn Tyson, was elected in 2009, the administratorship terminated.  Plaintiff alleges that this election was illegitimate, as Luciano and Glynn placed Tyson in office after rescinding their offer to Bethy Guiles-Smith.  Again, there is no admissible evidence to support this allegation.

Plaintiff filed complaints with the Connecticut Commission on Human Rights and Opportunities and the Equal Employment Opportunity Commission on December 14, 2006.

F.  Comparators Who Received More Favorable Treatment

Plaintiff discusses several white union members and officers who did not advocate on behalf of minority members and whom defendants allegedly treated favorably.  She argues that the treatment of these similarly situated Caucasians shows that defendants discriminated against her by auditing her Local and removing her from her position.

Carol Dimmock, a Caucasian woman, was the Local 704 President from 1978 to 2007.  Plaintiff's affidavit states, "Dimmock's plundering of L704 funds was legendary and commonly known . . . by Defendant AFSCME Council IV and Defendant AFSCME International"; however, plaintiff does not

indicate that she has personal knowledge of these facts.
Plaintiff filed complaints against Dimmock, as did Leon,
current Local 704 President Wilson Maestre-Soto, and current
Local 704 Treasurer April Hall.  International did not
remove Dimmock from office.  Maestre-Soto filed charges
against Dimmock, claiming that tens of thousands of dollars
were missing from Local 704's checking, CD and money market
accounts; several computers were missing; several years of
financial records were missing; and Local 704's credit card
had incurred tens of thousands of dollars of unaccounted-for
charges.[9]  As a result, plaintiff states, an audit was
conducted and formal findings were made against Dimmock;
however, plaintiff does not support this statement with
evidence.[10]  Plaintiff further alleges, without support,
that Luciano refused to help Maestre-Soto's formulate his
charges and instead assisted Dimmock by failing to enforce
International's disciplinary recommendations.  Luciano
allegedly ignored a finding that Dimmock owed nearly $20,000

_____

[9] Plaintiff states that Maestre-Soto discussed the charges
he filed with her and she made changes that he incorporated.  If
she did not observe the charges for herself, this evidence is
hearsay and inadmissible.

[10] Plaintiff's evidence supports a finding that
International conducted an audit of Local 704 at some point, but
it does not discuss the results of the audit.

in fraudulent claims, and neither he nor International pursued Dimmock's removal from office; instead, Dimmock left of her own accord several years after the audit.[11]  Again, neither the allegations concerning findings and recommendations against Dimmock nor the allegations that defendants failed to act on those findings are supported by admissible evidence.

In addition to her discussion of Dimmock, plaintiff cites the case of her coworker Sandy Dearborn.  In 2007, plaintiff filed a complaint alleging that Dearborn had not been to work on a daily basis for nearly eight years. Plaintiff was personally aware that Dearborn had been paid for those eight years.  Plaintiff alleges  that after she filed the complaint, state officials negotiated a deal in which Dearborn was not disciplined but instead promoted. Plaintiff does not say what part, if any, defendants International and Council 4 played in this process.

Plaintiff also details misbehavior of Linda Franco, a Caucasian woman who served as Local 538's Vice President from 1988 to 2002.  Franco traveled to Las Vegas for an

---

[11] The only evidence of these facts is plaintiff's own affidavit, and plaintiff has not indicated how she would have personal knowledge of Luciano's response to audit findings.

AFSCME convention in 2002.  Upon her arrival, she asked Leon to lend her money for expenses, explaining that she had gambled away the $875 he had already given her.  Leon refused, and Franco returned to Connecticut without participating in the convention.  The Executive Board issued a letter to Franco ordering her to appear and explain her conduct.  Franco refused and used a racial slur against plaintiff.  Plaintiff claims that Luciano and Hooker had told Franco she did not have to attend the meeting, but plaintiff provides no non-hearsay evidence for that proposition.

Franco also fraudulently participated in union business while out of work and on worker's compensation, and the state Attorney General investigated this fraud.  Plaintiff alleges that Luciano and Hooker intervened on Franco's behalf, reasoning that since they were the only ones who could have requested that she be released from work to attend the Las Vegas convention, they must have done so. Plaintiff was subpoenaed to attend a deposition regarding Franco's worker's compensation claim.  Hooker told plaintiff that, per Luciano's instructions, she would not be provided with Council 4 assistance at the deposition.   Plaintiff

acknowledges that she has no evidence of white union members receiving Council 4 assistance at depositions.

Franco resigned, stating that she was forwarding all possessions she had removed to Council 4.  In fact, a number of financial records were not sent to Council 4 nor to Local 538.  In January 2007, Luciano stated that he had these records.  He had held onto them during the investigation of plaintiff and Leon, even though he knew they were relevant to the audit.

III.  <u>Discussion</u>

Plaintiff asserts seven claims: race discrimination and retaliation in violation of 42 U.S.C. § 1981, race discrimination and retaliation in violation of Title VII of the Civil Rights Act of 1964, conspiracy to deprive plaintiff of equal protection under the law in violation of 42 U.S.C. § 1985, aiding a conspiracy or negligence in preventing a conspiracy in violation of 42 U.S.C. § 1986, and intentional infliction of emotional distress.  Plaintiff claims that Council 4 discriminated against her and other minority members of her Local by failing to provide them with adequate representation at Step III hearings and other proceedings.  Plaintiff further claims that Council 4

Executive Director Sal Luciano conspired with Pat Glynn and
other International officials to audit Local 538 without
cause, fabricate results, and remove her and Leon without an
adequate hearing, all in retaliation for her longtime
advocacy on behalf of African-American and Latino members of
her Local.  The defendants move for summary judgment urging
that on the record before the Court, no reasonable jury
could find in favor of the plaintiff.  I agree and therefore
grant the motions.

　　A.  <u>Section 1981: Race Discrimination</u>

　　Under 42 U.S.C. § 1981, persons of all races have the
equal right to "make and enforce contracts," which includes
"the making, performance, modification, and termination of
contracts, and the enjoyment of all benefits, privileges,
terms and conditions of the contractual relationship."  To
establish a claim under § 1981 against a defendant,
plaintiff must show that (1) she is a member of a racial
minority, (2) the defendant subjected her to intentional
discrimination based on her race, and (3) the discriminatory
conduct relates to one of the statute's enumerated
activities, including making and enforcing contracts.  <u>Brown
v. City of Oneonta</u>, 221 F.3d 329, 339 (2d Cir. 2000).

-27-

Plaintiff claims that the defendants committed at least two violations of § 1981.  First, plaintiff claims that Council 4 had a practice of unfairly representing minority union members at grievance proceedings.  Council 4 service representatives failed to introduce evidence of racial discrimination against the grievants, and they refused to allow plaintiff, Leon or Thomson to introduce this relevant evidence.  Through its inadequate representation, then, Council 4 prevented these grievants from enforcing their rights under their collective bargaining agreement ("CBA").[12]  Second, plaintiff claims that she, like other minority members, was denied access to the benefits of the CBA when she was prevented from defending herself during the administratorship hearing.

1.  *Council 4's Practice of Unfair Representation*

Plaintiff claims that Council 4 prevented minority union members from enforcing their rights under the CBA, in violation of § 1981, by failing to provide them with adequate representation in grievance proceedings.  On the

_____

[12] At oral argument, counsel indicated that these past grievances were discussed only to show plaintiff's protected activity.  However, plaintiff's brief strongly suggests that she understands inadequate representation at grievances to constitute a separate violation.  See, e.g., Pl.'s Br. 50.  I therefore address them separately.

record before the Court, a jury could not reasonably find that Council 4 intentionally discriminated based on race. Moreover, plaintiff's claim against Council 4 is largely time-barred.[13]

a. *Intentional Discrimination*

Council 4 argues that plaintiff cannot prove the second element of her § 1981 race discrimination claim, which requires her to prove that the defendant intentionally discriminated based on race. Council 4 contends that plaintiff lacks evidence of intentional race discrimination because she has failed to provide examples of similarly situated Caucasian union members who were treated differently. See Johnson v. Artim Transp. Sys., Inc., 826 F.2d 538, 542-43 (7th Cir. 1987) (upholding a finding that plaintiff failed to show some evidence of racial discrimination when he failed to show that his union had treated similarly situated white members in a different

---

[13] The parties' briefs do not address whether plaintiff has standing to bring this claim. I am doubtful that plaintiff can recover for instances of discrimination against others. Standing is generally decided before all other issues, as it determines subject matter jurisdiction. See Nnebe v. Daus, 644 F.3d 147, 156 (2d Cir. 2011). However, as plaintiff indisputably has standing to bring other claims, as defendants have not challenged standing, and as I dismiss plaintiff's claim on alternate grounds, I do not analyze whether plaintiff has standing here.

fashion).  I agree.  While plaintiff has averred that
certain pieces of evidence she deemed relevant were not
presented at grievance hearings involving minority
grievants, she has not shown that Council 4 service
representatives introduced all helpful evidence on behalf of
white grievants.  And the evidence in the record relating to
her two potentially relevant comparators does not support a
reasonable inference of disparate treatment based on race.

One potentially relevant comparator is Sandy Dearborn.
Plaintiff complained that Dearborn was being paid for work
even when she did not report for work, and Dearborn's case
terminated in Dearborn's favor.  Plaintiff does not allege
that Council 4 ever represented Dearborn in a grievance
proceeding, however, and it is undisputed that state
officials, not union officials, decided that Dearborn should
be promoted.  Given this record, Dearborn is not a valid
comparator.

Plaintiff also points to Rosemary Cusano, who was
permitted to pursue an untimely Step III grievance.  The
record shows that state officials worked with Cusano's Local
and Council 4 to reinstate her employment.  Plaintiff does
not say what, if anything, service representative Little did

to cause this favorable outcome.  The only evidence of the
quality of Little's representation is that he filed an
untimely grievance and Cusano wound up getting a positive
result.  The State's willingness to negotiate does not
permit an inference that Little provided superior
representation at a grievance hearing.  If anything, the
record shows that the State, not a defendant to this suit,
favored Cusano.[14]

    b.  *Statute of Limitations*

International argues that a three-year statute of
limitations applies; therefore, when plaintiff filed suit in
November 2008, almost all the instances of inadequate
representation alleged in the complaint were time-barred,
including the two instances involving the plaintiff as a
grievant.  International is correct that the statute of
limitations for a § 1981 claim is three years in
Connecticut.  See Rivera v. Men's Wearhouse, Inc., No.
3:05-CV-1907 (WWE), 2006 WL 1801705, at *4 (D. Conn. June
27, 2006) ("As for plaintiff's claims pursuant to § 1981 and
the intentional infliction of emotional distress, they are

---

[14] Since the § 1981 race discrimination claim fails on this
basis, I do not address whether inadequate representation may
constitute interference with the CBA for purposes of § 1981.

controlled by the Connecticut personal injury statute of
limitations: three years."). International further argues
that filing a CHRO complaint does not toll the limitations
period. See Johnson v. Ry. Express Agency, Inc., 421 U.S.
454, 465-66 (1975). Plaintiff responds that courts within
the Second Circuit are split on how to apply Johnson;
however, the cases plaintiff cites question whether filing
an administrative complaint tolls the statute of limitations
on *state* claims; they do not cast doubt on whether Johnson
continues to be good law with regard to § 1981 claims. See
Duran v. Jamaica Hosp., 216 F. Supp. 2d 63, 67 (E.D.N.Y.
2002) ("Courts in the Second Circuit are split on whether
the statute of limitations with respect to a state law claim
is tolled when a state claim arises from the same set of
facts as a Title VII claim timely filed with the NYSHRL or
the EEOC."). Johnson therefore applies.

    Plaintiff argues that International's reliance on the
statute of limitations is misplaced because her allegations
satisfy the continuing violation doctrine. I disagree.
"[I]f a plaintiff has experienced a continuous practice and
policy of discrimination, the commencement of the statute of
limitations period may be delayed until the last

                              -32-

discriminatory act in furtherance of it." Fitzgerald v.
Henderson, 251 F.3d 345, 359 (2d Cir. 2001) (internal
quotations omitted).  Plaintiff herself has not experienced
a continuous practice of discrimination.  She was the
subject of only two hearings – her Loudermill hearing and
her reclassification hearing – both of which occurred more
than three years before the filing of this suit.  Further,
as discussed above, the evidence does not support a finding
that Council 4 had a practice of discriminating against
minorities.  Therefore, plaintiff's claim is largely barred
by the statute of limitations.

In short, plaintiff's § 1981 race discrimination claim
based on past instances of inadequate representation fails
for at least two reasons: plaintiff cannot sustain her
burden of proving race discrimination, and the limitations
period for much of her claim, including the only two
instances that affected her personally, expired before this
suit was brought.

   2.   *Inadequate Opportunity To Be Heard at the*
        *Administratorship Hearing*

International argues that plaintiff has failed to
present evidence that she was given an insufficient

opportunity to be heard at the administratorship hearing.  I
agree.  Plaintiff cites only the affidavit of Nelson Leon as
a basis for this claim, and Leon's affidavit does not
discuss procedural defects at the hearing.  Plaintiff admits
she had an opportunity to testify and cross-examine Tyler.
And while Seferian's decision does not recount all of Leon's
testimony, it includes a sufficient portion to show that
Leon's statement was heard and considered.  In addition,
plaintiff does not present evidence that Caucasians were
treated differently at similar hearings.  Therefore,
plaintiff fails to show that she was given an inadequate
opportunity to be heard, in violation of the CBA and as a
result of race discrimination.

    B.  <u>Section 1981: Retaliation</u>

    Plaintiff argues that in retaliation for her and Leon's
advocacy on behalf of minority members in the union, Luciano
and Glynn conspired to have them removed from their
positions by conjuring a false picture of financial
mismanagement.  Courts evaluate § 1981 retaliation claims
under a burden-shifting analysis: first, the plaintiff must
establish a prima facie case of retaliation; next, the
employer or, in this case, the union, must articulate a

legitimate, nonretaliatory reason for the adverse action against the plaintiff; and the plaintiff must then show that retaliation was a substantial motivating factor for the adverse action.  <u>Fincher v. Depository Trust & Clearing Corp.</u>, 604 F.3d 712, 720 (2d Cir. 2010); <u>see also</u> <u>Beachum v. AWISCO N.Y.</u> 785 F. Supp. 2d 84, 98, 98 n.8 (S.D.N.Y. 2011), aff'd, 459 Fed. App'x. 58 (2d Cir. 2012).  I conclude that plaintiff's claim fails at both the first and third steps. She has not established a prima facie case and is unable to show a causal connection between the adverse actions at issue and her protected activity.

1.  *Prima Facie Case*

To establish a prima facie case of retaliation, plaintiff must show (1) participation in protected activity; (2) the defendant knew of the protected activity; (3) an adverse employment action; and (4) a causal connection between the protected activity and the adverse employment action.  <u>Fincher</u>, 604 F.3d at 720.

Plaintiff presents sufficient evidence to establish that she participated in protected activity.  "Protected activity" is "action taken to protest or oppose statutorily prohibited discrimination."  <u>Cruz v. Coach Stores, Inc.</u>, 202

F.3d 560, 566 (2d Cir. 2000).  Plaintiff need not show that
the conduct she opposed actually violated anti-
discrimination law, only that she possessed a good-faith,
reasonable belief that it did.  Galdieri-Ambrosini v. Nat'l
Realty & Dev. Corp., 136 F.3d 276, 292 (2d Cir. 1998).
Here, plaintiff states that on several occasions, she spoke
with Council 4 staff representative Gayle Hooker and
demanded that Council 4 provide effective representation to
minorities at grievance proceedings.  In the case of her own
reclassification proceeding, plaintiff told Hooker that
Cashman's allegedly inadequate representation was an
instance of "the same racial discriminatory practices that I
have complained to you [about] repeatedly."  She also states
that she told service representatives they should present
certain pieces of evidence she deemed relevant, and she
advised Vicky Ward to file a complaint about Cashman's
representation.  Based on plaintiff's affidavit, a
reasonable jury could find that service representatives
repeatedly failed to present evidence she believed to be
relevant on behalf of minority grievants, and she took steps
to oppose this practice, which she reasonably believed to be

discriminatory.[15]

A jury could also find that Council 4 officials, including Gayle Hooker and Sal Luciano, knew about this protected activity.  Plaintiff spoke with Hooker about a number of her concerns, and she copied Luciano on her email addressed to Vicky Ward.  However, plaintiff has not presented evidence that International officials knew about her advocacy.  Therefore, she cannot maintain a retaliation claim against International.

Plaintiff is unable to establish that defendant Council 4 took an adverse action against her; International, not Council 4, put Local 538 under administratorship and removed plaintiff from her position.  An action is materially adverse when it would dissuade a reasonable person from engaging in protected activity.  Burlington N. & Santa Fe Ry. Co. v. White, 548 U.S. 53, 68 (2006).  Plaintiff alleges that Luciano pressured the audit department to investigate false allegations and produce false results, wrote a charge accusing plaintiff of financial mismanagement, and coaxed

---

[15] Plaintiff also contends that she engaged in protected activity by publicly protesting the union's 2004 dues increase. While plaintiff may have said that the dues increase would disproportionately affect Local 538's many minority members, she has not shown a good faith, reasonable belief that the dues increase was discriminatory.

Bethy Guiles-Smith into signing it as her own.  Were that the case, plaintiff would establish that Council 4 took adverse action against her.  However, the only part of plaintiff's version of events that is supported by admissible evidence is her allegation that Luciano pressured International to audit after it received a letter from Local 538 members accusing her of financial mismanagement. Although a person of ordinary firmness might be discouraged from engaging in protected activity by a Council official's unprovoked insistence on an audit, here, his encouragement was not unprovoked: a letter accused plaintiff and Leon of financial mismanagement, and records showed that Local 538 had reported the exact same number of members for many months.  I do not think an ordinary Local official would be dissuaded from engaging in protected activity by the realization that if she were accused of mismanagement, her Council would push for an audit.  Again, plaintiff cannot show that the charging document was fabricated or that Luciano directed the audit department to falsify its results.  The evidence may also permit a finding that throughout the audit, Luciano kept the 2001-2002 financial records Linda Franco had given him.  As those records were

of little importance in the scope of the audit, however,
Luciano's retantion of the records does not meet the White
standard.

The International union did take several adverse
actions against plaintiff and Leon.  It issued reports
stating that they had falsified financial information and
ultimately removed them from their positions.  Any one of
these actions could dissuade a person of ordinary firmness
from engaging in protected activity.  However, as noted
above, plaintiff has presented no evidence that
International knew of her protected activity.  Therefore,
she cannot establish a prima facie case against either
defendant.

Further, plaintiff cannot show a causal connection
between her protected activity and the audit.  The allegedly
retaliatory activity took place in 2006.  Plaintiff had been
engaged in protected activity since at least 1997, when she
complained about Little's representation of Nigel Morris.
The most recent protected activity before Luciano encouraged
the audit department to investigate, in March 2006, was
Leon's advocacy on behalf of William Barron, who was

terminated in July 2005.[16]  Therefore, plaintiff cannot establish a causal connection based on temporal proximity. See, e.g., Stoddard v. Eastman Kodak Co., 309 Fed. App'x. 475, 480 (2d Cir. 2009) (gap of two months insufficient on its own to establish causal connection); Dayes v. Pace University, 2 Fed. App'x. 204, 208 (2d Cir. 2001) (seven months insufficient); Hollander v. Am. Cyanamid Co., 895 F.2d 80, 85 (2d Cir. 1990) (three-and-a-half months insufficient).  The intervening event of the letter also weighs against a finding that plaintiff's protected activity caused Luciano to encourage the audit.  Even with the facts construed in her favor, plaintiff fails to establish a prima facie case of retaliation.

2.  *Defendants' Legitimate, Non-Retaliatory Reason*s

Defendants have provided legitimate, non-retaliatory reasons for their actions.  Members sent a letter expressing concern about Local 538's leadership, and the Local had reported the same number of members every month for two years.  Therefore, Luciano had reason to suspect that plaintiff and Leon were engaging in improper financial activity, and he had reason to push for an audit of the

---

[16] The complaint says this happened in 2004, but plaintiff's affidavit claims Barron's grievance occurred in 2005.

Local.  The audit report concluded that plaintiff and Leon
had indeed engaged in financial mismanagement and were using
Local funds for their own benefit.  International,
therefore, had a legitimate reason for putting the Local
under administratorship and removing plaintiff and Leon from
their positions.  Viewing the evidence in the light most
favorable to plaintiff, all Local expenses were approved by
the Executive Board, and the Local's under-reporting was
accidental and somewhat smaller than the report indicated.
However, there is no competent evidence that the report was
written in bad faith, and International was under no
obligation to believe plaintiff and Leon over its auditors.

   3.  *Retaliation as a Reason for Defendants' Actions*

     Plaintiff cannot establish that retaliation was a
substantial reason for the audit or her removal.  As noted,
plaintiff cannot demonstrate that Luciano targeted her, nor
can she show that any targeting was related to her protected
activity.  She also fails to show a causal connection
between her protected activity and International's decision
to put her Local under an administratorship and remove her
and Leon from their positions.

     Plaintiff cannot show that similarly situated persons

who did not engage in protected activity were treated differently by Council 4 or International.  She fails to present competent evidence that International conducted an audit and made formal findings against former Local 704 president Carol Dimmock.  Therefore, she also fails to show that Luciano refused to enforce International's disciplinary recommendations.  While plaintiff's allegations, if accepted, might permit a finding of bias, she has not substantiated those allegations.

Plaintiff was not similarly situated to her other comparators.  There is no evidence that defendants were involved in the decision to promote Sandy Dearborn.  And as plaintiff avers, Linda Franco resigned after being notified that her removal was imminent.  She did not fare any better than plaintiff.  Plaintiff, therefore, fails to support a finding that defendants audited her Local and removed her and Leon in retaliation for protected activity.

C.  Title VII: Race Discrimination

Title VII provides, "[i]t shall be an unlawful employment practice for a labor organization to exclude or to expel from its membership, or otherwise to discriminate against, any individual because of his race, color,

religion, sex, or national origin." 42 U.S.C. §
2000e-2(c)(1).  Plaintiff claims that defendants' allegedly
discriminatory actions – inadequate representation of
minority grievants and the administratorship over Local 538
– violated Title VII as well as § 1981.

The parties disagree as to which standard this Court
should apply in evaluating plaintiff's claim.  Plaintiff
argues "all that is required to state a Title VII claim
against a union is a breach of the duty of fair
representation because of race." Agosto v. Corr. Officers
Benev. Ass'n, 107 F. Supp. 2d 294, 305 (S.D.N.Y. 2000).  A
union may breach this duty even when the employer has not
breached the CBA.  Id. at 304.  "A union breaches [the duty
of fair representation] when its actions are 'arbitrary,
discriminatory, or in bad faith.' " Agosto, 107 F. Supp. 2d
at 303 (quoting Air Line Pilots Ass'n Int'l v. O'Neill, 499
U.S. 65, 67 (1991)). Council 4 argues that a narrower test
should be applied in accordance with Bugg v. Int'l Union of
Allied Indus. Workers, Local 507, 674 F.2d 595 (7th Cir.
1982), which traditionally governs Title VII claims against
a union.  The Bugg test requires a plaintiff to show (1) the
employer committed a violation of the collective bargaining

agreement with regard to her, (2) the union permitted the breach to go unrepaired, thus breaching its own duty of fair representation, and (3) there was some indication that the union's actions were motivated by racial animus.  Id. at 598 n.5.

While the Second Circuit has not yet endorsed Agosto, which rejects Bugg as too narrow, several district courts have relied on its analysis.  See, e.g., McIntyre v. Longwood Cent. Sch. Dist., 658 F. Supp. 2d 400, 421-22 (E.D.N.Y. 2009) ("As the court in Agosto acknowledged, the Bugg test, which arose in the context of an alleged breach of a collective bargaining agreement, is likely too narrow a statement of the law.").  And while the Second Circuit has cited to the Bugg test in a few summary orders, its most recent, relevant decision did not reference the requirement that the employer have violated the CBA.  See McIntyre v. Longwood Cent. School Dist., 380 Fed. App'x. 44, 49 (2d Cir. 2010).  The language of Title VII itself prohibits discrimination in the broadest terms.  Therefore, I agree with the Agosto court that plaintiff need not show her employer violated the CBA; she need only show the union breached its duty of fair representation because of race.

However, she has failed to make this showing.

For substantially the reasons stated above, plaintiff fails to raise a triable issue as to whether the union inadequately represented minorities at Step III of their grievances because of race discrimination.  Plaintiff has failed to produce evidence of similarly situated Caucasians who received superior representation from Council 4. Therefore, plaintiff has not presented evidence that Council 4's actions were arbitrary, discriminatory, or in bad faith. And again, much of plaintiff's claim, including her reclassification grievance – likely the only portion of the claim she has standing to bring – is time-barred.  This portion of plaintiff's Title VII claim fails.

Plaintiff also cannot show that the audit, administratorship or removal violated Title VII. International argues that internal auditing decisions are removed from the usual sphere of "fair representation," so plaintiff cannot bring a claim against the union under Title VII, even if the audit was conducted for discriminatory reasons.  Plaintiff disagrees.  Neither cites any case law. I need not decide this question, however.  For substantially the reasons stated above, in connection with plaintiff's

§ 1981 retaliation claim, plaintiff cannot show that the audit, administratorship, or removal occurred because of her race.  She has failed to present competent evidence of a conspiracy between Luciano and Glynn to remove her from her position, and she has failed to produce evidence of any similarly situated comparators outside her protected group who were treated differently.  International has presented evidence of two instances where white officers were accused of financial malfeasance and the Locals – 287 and 2511 – were put under administratorship.  And Glynn's affidavit notes that an administratorship over the all-minority board of Local 1161 was lifted when the board cooperated with International.  Plaintiff has not presented evidence that any of defendants' actions were arbitrary, discriminatory, or taken in bad faith.

    D.   <u>Title VII: Retaliation</u>

Plaintiff claims defendants' allegedly retaliatory activity also violates Title VII.  The standard for a retaliation claim under Title VII is the same as the standard under § 1981.  <u>Fincher v. Depository Trust & Clearing Corp.</u>, 604 F.3d 712, 720 (2d Cir. 2010).  Thus, the Title VII retaliation claim fails for the same reasons

stated above regarding the § 1981 retaliation claim.

    E.   <u>Section 1985(3): Conspiracy</u>

Plaintiff alleges that defendants conspired to deny fair representation to minority grievants and to silence plaintiff's protests of inadequate representation; and she alleges that defendants, led by Luciano and Glynn, conspired to initiate an unwarranted investigation into Local 538's finances, to interfere with her ability to defend herself at her hearing, and to remove her from her position as Local 538 president.  The elements of a § 1985(3) conspiracy claim are: "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States." <u>United Bhd. of Carpenters, Local 610 v. Scott</u>, 463 U.S. 825, 828-29 (1983).  In addition, the conspiracy must be motivated by racial animus.  <u>Id.</u> at 829.  Plaintiff's conspiracy claim fails.  She cannot establish the first element, a conspiracy, because she has not provided

competent evidence that Luciano conspired with Guiles-Smith, Glynn or International's auditing department.  At most she has shown that Luciano pressured the auditing department to conduct the audit; however, as she has not presented competent evidence that the audit, which led to her removal, was conducted improperly, she has not shown a conspiracy to deprive her of her rights.  She has also failed to show that any of defendants' acts were motivated by racial animus.

F.   Section 1986: Negligence in Preventing or Aiding a Conspiracy

Plaintiff claims that International's auditing department violated § 1986 by aiding Luciano and Glynn in their alleged conspiracy to deprive plaintiff of her rights. Section 1986 provides a cause of action against anyone who, "having knowledge that any of the wrongs conspired to be done and mentioned in section 1985 are about to be committed and having power to prevent or aid, neglects to do so." Katz v. Morgenthau, 709 F. Supp. 1219, 1236 (S.D.N.Y. 1989), aff'd in part and rev'd in part on other grounds, 892 F.2d 20 (2d Cir. 1989).  The parties agree that this claim stands or falls on plaintiff's § 1985(3) claim.  See Lopez v. McGill, No. 3:08-CV-01931 (CSH), 2009 WL 179787, at *7 (D.

-48-

Conn. Jan. 21, 2009) ("Section 1986 provides relief only to 'any of the wrongs conspired to be done, and mentioned in section 1985 of this title are actually 'committed.'" 42 U.S.C. § 1986.").  Plaintiff cannot succeed on her § 1985 claim; therefore, her § 1986 claim also is unavailing.[17]

G.   Intentional Infliction of Emotional Distress

Finally, plaintiff claims that defendants' alleged actions make them liable for intentional infliction of emotional distress under Connecticut law.  To establish this claim, a plaintiff must show, "(1) that the [defendant] intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) that the [defendant's] conduct was extreme and outrageous; (3) that the defendant's conduct was the cause of the plaintiff's distress; and (4) that the emotional distress sustained by the plaintiff was severe." Appleton v. Bd. of Educ., 254 Conn. 205, 210 (2000).

Plaintiff fails to show that defendants engaged in extreme and outrageous conduct.  Even if she could support

---

[17] International relies on § 1986's one-year statute of limitations.  See Paige v. Police Dep't of City of Schenectady, 264 F.3d 197, 199 n.2 (2d Cir. 2001).  As the events at issue occurred in 2006, and this case was filed in 2008, the § 1986 cause of action is time-barred.

her claim that Council 4 provided inadequate representation
to minorities, "claims that '[t]he union discriminates
against African-Americans,' 'does not represent African-
Americans in the same way it does white union members,' and
'failed to follow the grievance procedure,' or that Luciano
failed to hold meetings in response to plaintiff's concerns
about widespread racism, even if proven to be otherwise
unlawful, do not show the extreme and outrageous conduct
required for this tort." Smith v. AFSCME Council 4, No.
05cv829 (JBA), 2007 WL 735815, at *4 (D. Conn. March 8,
2007).[18]  If plaintiff could prove that Luciano conspired
with others to falsely brand her a thief and unjustly remove
her from office, she might well be able to satisfy this
element of the tort.  See, e.g., Musacchio v. Cooperative
Educations Svcs., No. CV 94 0137050 S, 1995 WL 681664 (Conn.
Super. Ct. Nov. 8, 1995) (jury could find that supervisor's
false accusation of lying amounted to extreme and outrageous
conduct).  However, the record cannot support a finding that
Luciano schemed against plaintiff.  Nor is there competent
evidence showing that the defendants engaged in extreme and
outrageous conduct.

---

[18] The plaintiff in this eerily similar 2007 case was a
different Ms. Smith.

IV.  <u>Conclusion</u>

Accordingly, defendants' motions for summary judgment (docs. 224 & 228) are hereby granted.  The Clerk will enter judgment in defendants' favor and close the file.

So ordered this 17th day of August 2012.

_____/s/ RNC_____
Robert N. Chatigny
United States District Judge
